UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DELL INC. and DELL PRODUCTS L.P., <br><br> Plaintiffs, <br><br> v. <br><br> HITACHI-LG DATA STORAGE, INC.; HITACHI-LG DATA STORAGE KOREA, INC.; HITACHI, LTD.; PHILIPS & LITE-ON DIGITAL SOLUTIONS CORP.; PHILIPS & LITE-ON DIGITAL SOLUTIONS USA, INC.; LITE-ON IT CORP. OF TAIWAN; KONINKLIJKE PHILIPS ELECTRONICS N.V.; BENQ CORPORATION; BENQ AMERICA CORPORATION;SONY CORPORATION; SONY OPTIARC INC.; NEC CORPORATION; SONY NEC OPTIARC INC.; SONY OPTIARC AMERICA INC.; SONY ELECTRONICS, INC.; TOSHIBA CORPORATION; SAMSUNG ELECTRONICS CO. LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; TOSHIBA AMERICA INFORMATION SYSTEMS, INC.; TOSHIBA SAMSUNG STORAGE TECHNOLOGY CORP.; TOSHIBA SAMSUNG STORAGE TECHNOLOGY CORP. KOREA; <br><br> Defendants. | CASE NO.: 13-cv-393 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs Dell Inc. and Dell Products L.P. ("Dell") bring this action for damages and injunctive relief under Sections 4 and 16 of the Clayton Act for the Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. §1, and for breach of contract. Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims and those lawsuits have been joined for pretrial purposes in *In re Optical Disk Drive Products Antitrust Litigation*, 3:10-md- 02143, in the Northern District of California.

### I.  INTRODUCTION

1. Dell brings this action on behalf of itself and its affiliates to recover for injury to its business and property and other harms arising from billions of dollars of purchases, at

1

artificially inflated prices, over several years, of optical disk drives ("ODDs"). Defendants and their co-conspirators participated in a price-fixing conspiracy from as early as January 1, 2004, through around January 1, 2010 (the "Relevant Period"). The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize and maintain prices for ODDs. Pursuant to this price-fixing conspiracy, the Defendants and their co-conspirators engaged in a series of integrated and overlapping anticompetitive acts. These anticompetitive acts included rigging bids for ODDs in procurement events conducted by Dell and other Original Equipment Manufacturers ("OEMs"), sharing confidential information including pricing, sales, production, bidding strategies and rankings, pull rates, and Total Available Market ("TAM") in order to facilitate price coordination, entering agreements to set prices for ODDs sold in the United States to OEMs including Dell, and allocating customers and markets. Dell paid higher prices for ODDs than it would have paid in a competitive market as a direct result of Defendants' and their co-conspirators' unlawful conduct. Dell seeks to recover compensatory damages for its ODD purchases from the Defendants and their subsidiaries, affiliates, and co-conspirators during the Relevant Period.

2.    An ODD uses a laser to read or write data to or from an optical disc. ODDs can be internal drives manufactured to be incorporated into notebook and desktop computers, camcorders and/or game consoles, or they can be external drives that attach to computers, camcorders and/or game consoles by means of an external interface, such as a Universal Serial Bus ("USB") connection. ODDs utilize the following optical disc formats: (a) compact discs ("CDs"), such as CD-ROMs or CD-recordable/rewritable discs ("CD-R/RWs"); (b) digital versatile discs ("DVDs"), such as DVD-ROMs or DVD-recordable/rewritable discs ("DVD±R/RWs"); (c) Blu-ray products, such as Blu-ray discs ("BDs") and Blu-ray-recordable/rewritable discs ("BD-R"/"BD-RWs"); (d) High Definition DVDs ("HD-DVDs"); and (e) Super Multi-Drives or other combination drives that play various of the foregoing media. These formats are described in greater detail below.

3.    ODDs that are external drives are sold alone, typically with some sort of

connecting interface. ODDs that are internal drives are used inside of products such as computers. ODDs are also widely used in computers to read and write data for a variety of uses, including software programs and data compilations.

4.  During the Relevant Period, ODDs served as one of the principal means for recording and reading music, movies, and other digital data. During this time, Defendants' and their co-conspirators' sales of ODDs generated billions of dollars in annual revenues and expanded exponentially with the increased utilization of computers and other products in households and businesses throughout the United States during the Relevant Period. Until very recently, in the United States and across the world, almost all forms of home entertainment and data storage were on optical discs. Most computers that are used or sold in the United States today come equipped with an ODD. During the Relevant Period, the Defendants and their co-conspirators controlled more than 90% of this market.

5.  The United States Department of Justice ("DOJ") is investigating price fixing in the ODD market. The DOJ's investigation already includes an application for amnesty by one group of conspirators named herein. Many of the Defendants and co-conspirators named in this Complaint have a sordid history of engaging in anticompetitive conduct, including price-fixing conduct for electronic component parts used in computers assembled and sold by Dell, such as Dynamic Random Access Memory ("DRAM"), Thin Film Transistor Liquid Crystal Display ("TFT-LCD") panels, and Cathode Ray Tubes ("CRTs").

6.  On November 8, 2011, the United States of America and ODD manufacturer Hitachi-LG Data Storage, Inc. ("HLDSI") entered a plea agreement in *U.S. v. Hitachi-LG Data Storage, Inc.*, No. CR11-00724-RS (N.D. Cal.). HLDSI is a joint venture between Hitachi, Ltd. and LG Electronics, Inc. In the plea agreement HLDSI admitted that it had engaged in felonious price-fixing conduct with co-conspirators in violation of Section 1 of the Sherman Act. In the plea agreement HLDSI admitted that, between approximately June 2004 and September 2009, HLDSI employees engaged in bid rigging and price fixing in the ODD industry, one purpose of which was "to rig ODD procurement events hosted by Dell." The

3

United States agreed not to prosecute most HLDSI employees, but explicitly carved out Young Keun Park, Sang Hun Kim, Sik Hur (aka Daniel Hur), and Woo Jin Yang (aka Eugene Yang), each of whom subsequently pled guilty to ODD-related antitrust violations. *U.S. v. Young Keun Park*, No. CR11-00911 (N.D. Cal.); *U.S. v. Yang*, No. CR12-00309 (N.D. Cal.); *U.S. v. Kim*, No. CR11-00912 (N.D. Cal.); *U.S. v. Hur*, No. CR11-00913 (N.D. Cal.).

## II.  JURISDICTION AND VENUE

7.     Dell brings this action to obtain injunctive relief under Section 16 of the Clayton Act, and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit and reasonable attorneys' fees arising from Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Dell also seeks to recover all appropriate damages for certain Defendants' breaches of contract, as alleged herein.

8.     The Court has subject matter jurisdiction over Dell's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Dell's breach of contract claims set forth below. These claims are so related to Dell's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

9.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce or were within the flow of, were intended to, and did have a direct, substantial and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This anticompetitive effect gives rise to Dell's antitrust claims. During the Relevant Period, Defendants' and their co-conspirators' conspiracy adversely affected the price of ODDs purchased in the United States. In particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the price of ODDs purchased by Dell.

10.     This court has jurisdiction over each Defendant named in this action under

4

Section 12 of the Clayton Act (15 U.S.C. § 22). Defendants and their co-conspirators purposely availed themselves of the laws of the United States as they manufactured price-fixed ODDs and products containing price-fixed ODDs they knew would be sold to customers in the United States. Defendants' and their co-conspirators' conspiracy affected commerce in the ODD market in the United States. Defendants are further subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Texas.

11.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant is either an alien corporation, transacts business in this district, or is otherwise found within this district. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Dell's claims occurred in this district including many of Dell's purchases of ODDs and internet negotiation events whereby Dell purchased some ODDs, and a substantial portion of the affected interstate trade and commerce was carried out in this district. Defendants and their co-conspirators knew that price-fixed ODDs would be sold and shipped into this District.

### III. PARTIES

#### A.     Plaintiffs

12.     Dell Inc. is a corporation duly organized under the laws of the State of Delaware, with its principal place of business in Round Rock, Texas.

13.     Dell Products L.P. is a Texas limited partnership with its principal place of business in Round Rock, Texas.

14.     Dell Inc. and Dell Products L.P. are sometimes referred to collectively herein as "Dell."

15.     Dell is a leading information technology company, offering a broad range of solutions, including services and products such as mobility products, desktop PCs, software and peripherals, including display devices, servers and networking services, and storage.

DELL'S COMPLAINT

16.    During the Relevant Period, Dell purchased price-fixed ODDs directly from Defendants and their co-conspirators, or Defendants' and their co-conspirators' subsidiaries and affiliates, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators or co-conspirators' subsidiaries and affiliates.  As a direct result of Defendants' and their co-conspirators' unlawful conduct, Dell suffered injury to its business or property.

17.    During the Relevant Period, Dell held frequent negotiations with Defendants and their co-conspirators on the price and volume of ODDs it purchased.  Dell held negotiations via multiple methods, including internet negotiations.  For much of the Relevant Period, these negotiations were conducted in Round Rock, Texas.  The agreed-upon price that resulted from the negotiation process was a worldwide price that applied to all of Dell's ODD purchases for the given time period, regardless of where the ODD was to be delivered.

18.    Dell has been specifically identified as a victim of price fixing for its purchases of ODDs in the guilty plea entered by HLDSI and other DOJ press releases.  HLDSI is an admitted felon.  HLDSI pled guilty to conspiring to fix prices and rig bids for ODDs sold to Dell, HP, and Microsoft, and agreed to pay a criminal fine of $21.1 million.

19.    Dell Inc. is effectuating assignment of claims with its relevant subsidiaries and affiliates, whereby any of the antitrust claims described in this Complaint against the Defendants and their co-conspirators, which are held by Dell's subsidiaries and affiliates, have been or will be assigned to Dell Inc.

## B.    Defendants

### 1.  Hitachi Defendants

20.    Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi, Ltd. controls an integrated global enterprise comprising itself and other entities including HLDSI. During the Relevant Period, Hitachi, Ltd., manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

6

21.    Defendant HLDSI is a business entity organized under the laws of Japan with its principal place of business located at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022. HLDSI is a joint venture formed in November 2000 and is owned 51% by Hitachi, Ltd. and 49% by LG Electronics Inc. It began operations in January 2001. During the Relevant Period, HLDSI manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

22.    Defendant Hitachi-LG Data Storage Korea, Inc. is a business entity organized under the laws of South Korea with its principal place of business located at LG Gasan Digital Center, 459-9 Gasan-dong, Geumcheon-gu, Seoul, 153-803 Korea. Hitachi-LG Data Storage Korea, Inc. is part of the joint venture formed in January of 2001 and is owned 51% by Hitachi, Ltd. and 49% by LG Electronics Inc. During the Relevant Period, Hitachi-LG Data Storage Korea, Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

23.    According to Hitachi, Ltd.'s SEC Form 20-F for the year ending March 31, 2011, Hitachi, Ltd. views HLDSI as a "subsidiary" in connection with the international antitrust investigations involving the ODD industry. Hitachi, Ltd. divides its international business into multiple segments; ODDs are part of the "Digital Media & Consumer Products" segment. There is a "Hitachi group global business (Americas)" headed by Tadahiko Ishigaki, a Senior Vice-President and Executive Officer of Hitachi, Ltd. As part of its ongoing restructuring of operations, Hitachi, Ltd. is "promoting shared services over a wide range of areas such as procurement, logistics, document services, security, personnel management and financial management." In a section entitled "Strengthening of Consolidated Group Management" Hitachi, Ltd. states:

> Our consolidated group includes a number of subsidiaries and affiliates including publicly listed companies. We have taken and continue to take measures with a view to fostering closer ties and establishing a closer capital relationship among such group companies and facilitating the timely implementation of business strategies and other initiatives, leading to improved competitiveness and profitability. For example, we

7

converted five listed consolidated subsidiaries into wholly owned subsidiaries, which we believe will benefit our Social Innovation Business by establishing closer ties and relationships and will also enable us to reflect the net income or loss attributable to noncontrolling interests in those companies as net income or loss attributable to Hitachi, Ltd. in our statement of operations.

\*\*\*\*

Furthermore, our headquarters division will focus additional attention on generating synergies and address issues that have group-wide implications such as the adoption of a uniform advanced IT platform and coordinating production engineering, procurement and our brand to help in-house companies and group companies strengthen competitiveness. Our headquarters division will also attempt to develop business fields that incorporate elements of our information and communication technology and social infrastructure businesses.

24.    Hitachi, Ltd. and its subsidiaries are referred to collectively in this Form 20-F as "Hitachi."

25.    In its SEC Form 6-K dated November 16, 2009 that is described in more detail below, Hitachi, Ltd. disclosed that: (a) "a subsidiary" in Japan and "a subsidiary" in Korea are the targets of investigations by various countries' antitrust agencies with respect to antitrust violations relating to ODDs; (b) these investigations may result in private actions being brought "against Hitachi" and (c) they could have a "material adverse effect on Hitachi's business." Hitachi, Ltd. reports financial data for HLDSI in its consolidated annual financial results, where it indicates that its "Optical Disk Drive operations" are conducted by HLDSI.

26.    Defendants Hitachi, Ltd., HLDSI and Hitachi-LG Data Storage Korea, Inc. are referred to individually and collectively herein as "HLDS." All of the entities referred to as HLDS participated in the collusive conduct described herein, either directly or as represented by other members of the HLDS entities.

### 2. Philips Defendants

27.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business at Groenewoudsweg 1, Einhoven 5261BA, the

8

Netherlands.  During the Relevant Period, Royal Philips controlled an integrated global enterprise comprising itself and other entities including Defendants Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc.  Royal Philips manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

28.  Defendant Philips & Lite-On Digital Solutions Corporation is a business entity organized under the laws of Taiwan, with its principal place of business located at 16F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C.  Philips & Lite-On Digital Solutions Corporation, established in March of 2007, is a joint venture created by Philips & Lite-On.  Philips & Lite-On Digital Solutions Corporation's operations include: design, development, sales, marketing, customer support, and service of ODDs.  During a portion of the Relevant Period, Philips & Lite-On Digital Solutions Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

29.  Defendant Philips & Lite-On Digital Solutions USA, Inc. is a business entity organized under the laws of Delaware, with its principal place of business located at 42000 Christy Street, Fremont, California 94538.  Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary company of Philips & Lite-On Digital Solutions Corporation.  Philips & Lite-On Digital Solutions USA, Inc. serves customers in the North American and Latin American regions.  During a portion of the Relevant Period, Philips & Lite-On Digital Solutions USA, Inc. manufactured, sold, and/or distributed ODDs to customers throughout the United States and imported ODDs into the United States.

30.  Defendants Royal Philips, Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. are referred to individually and collectively herein as "PLDS."  All of the entities referred to as PLDS participated in the collusive conduct described herein, either directly or as represented by other members of the PLDS group of Defendants.

DELL'S COMPLAINT

31.     Upon information and belief, in October of 2007, a representative of TSST indicated that "PLDS & Lite-on are completely identical companies with different names. Sony denies purchasing product from PLDS, that's why PLDS does business with Sony as name of Lite-on, but operation and manufacturing is exactly same."

### 3. Lite-On Defendant

32.     Defendant Lite-On IT Corporation of Taiwan ("Lite-On") is a business entity organized under the laws of Taiwan with its principal place of business located at 12F, 392, Ruey Kuang Road, Neihu, Taipei 114, Taiwan, R.O.C. Lite-On controls an integrated global enterprise comprising itself and other entities including Defendants Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. During the Relevant Period, Lite-On manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

### 4. BenQ Defendants

33.     Defendant BenQ Corporation is a business entity organized under the laws of Taiwan, with its principal place of business at 16 Jehu Rd., Neihu, Taipei 114, Taiwan. BenQ Corporation controls an integrated global enterprise comprising itself and other BenQ entities. In February of 2003, BenQ Corporation and Royal Philips formed BenQ Philips Digital Storage ("PBDS"), a joint venture intended to manufacture and distribute ODDs. PBDS was owned 51% by Royal Philips and 49% by BenQ Corporation. In April of 2006, Lite-On acquired BenQ Corporation's ODD business and eventually replaced BenQ Corporation in PBDS, which was reconstituted as Philips & Lite-On Digital Solutions Corporation in March of 2007. During the Relevant Period, BenQ Corporation, separately or through PBDS, manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

34.     Defendant BenQ America Corporation ("BenQ America") is a California corporation with its principal place of business at 15375 Barranca, Suite A205, Irvine, California 92618. BenQ America is a wholly owned and controlled subsidiary of Defendant

10

DELL'S COMPLAINT

BenQ Corporation. During the Relevant Period, BenQ America manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

35. Defendants BenQ Corporation and BenQ America are referred to individually and collectively herein as "BenQ." All of the entities referred to as BenQ participated in the collusive conduct described herein, either directly or as represented by other members of the Ben-Q group of Defendants.

### 5. Sony/NEC Defendants

36. Defendant Sony Corporation ("SC") is a business entity organized under the laws of Japan, with its principal place of business located at 1-7-1, Konan, Minato-Ku, TKY 108-0075, Japan. SC controls an integrated global enterprise comprising itself and other entities, including the other Sony and Sony Optiarc Defendants described herein. During the Relevant Period, Sony manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

37. Defendant Sony Optiarc Inc. is a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. During the Relevant Period, Sony Optiarc Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. Sony Optiarc, Inc. is now part of SC's Consumer Products & Devices Group and is headed by Shinichi Yamamura, who formerly ran Sony NEC Optiarc, Inc.

38. Defendant NEC Corporation ("NEC") is a business entity organized under the laws of Japan with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan. During the Relevant Period, NEC manufactured, sold, and distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

39. Defendant Sony NEC Optiarc Inc. ("Sony NEC") was a Japanese company with its headquarters located at 4-16-1 Okata, Atsugi-shi, Kanagawa 243-0021, Japan. Sony NEC was created on April 3, 2006 as a joint venture between Defendants SC and NEC in

11

which SC had a 55% interest and NEC had a 45% interest. These percentages were based on the present value of future cash flows each joint venturer would receive from the joint venture, including cash flows obtained through the conspiracy alleged herein. Defendant SC designated the President of Sony NEC and Defendant NEC designated the Vice-President. Shinichi Yamamura, who was Deputy President of Video Business Group of SC, became President of the new company. SC purchased NEC's interest in Sony NEC in 2008 and renamed it Sony Optiarc Inc. During a portion of the Relevant Period, Sony NEC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. The press release announcing Sony's purchase of NEC's interests in Sony NEC said that "[a]s a result of this agreement, Sony will make Sony NEC Optiarc Inc. a wholly owned subsidiary of the Sony group"; that Shinichi Yamamura, Deputy President of the Video Business Group of SC, would serve as Sony NEC's "Representative Director and President"; and that other directors were "[s]cheduled to be elected from within the Sony group."

40.    Defendant Sony Optiarc America Inc. is a wholly owned subsidiary of Sony Optiarc Inc. Sony Optiarc America Inc. is a Delaware corporation with its principal place of business located at 1730 N. First Street, San Jose, California 95112. Sony Optiarc America Inc. was originally established as a joint venture between Sony and NEC in April of 2006 before Sony announced that it would take over NEC's 45% share on September 11, 2008. During a portion of the Relevant Period, Sony Optiarc America Inc. manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

41.    Defendant Sony Electronics, Inc. ("SEI") is a Delaware corporation with its principal place of business at 555 Madison Avenue, 8th floor, New York, New York 10022. SEI is a wholly owned subsidiary of Sony Corporation of America, which in turn, is a wholly owned subsidiary of defendant SC. During the Relevant Period, SEI manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

42.     According to SC's SEC Form 20-F for the year ending March 31, 2011, SC is divided into business segments, including Consumer Products & Devices, Networked Products & Services, and B2B and Disc Manufacturing.  The former two segments contain ODDs. The Form 20-F states that "[i]n most cases, sales of Sony's electronics products are made to sales subsidiaries of Sony Corporation located in or responsible for sales in the countries and territories where Sony's products and services are marketed.  These subsidiaries then sell those products to unaffiliated local distributors and dealers or through direct sales via the Internet.  In some regions, sales of certain products and services are made directly to local distributors by Sony Corporation."  As the Form 20-F further explains, "Sony markets its electronics products and services through Sony Electronics Inc. and other wholly owned subsidiaries in the U.S." The independent accounting report in the Form 20-F refers to SC and its consolidated subsidiaries as "Sony."

43.     Upon information and belief, a former employee of Sony Optiarc Inc. has asserted that both Sony Optiarc Inc. and SEI are "controlled by Sony Corporation."

44.     Defendants Sony Optiarc America Inc., Sony NEC, and Sony Optiarc Inc. are referred to individually and collectively herein as "Sony Optiarc."  All of the entities referred to as Sony Optiarc participated in the collusive conduct described herein, either directly or as represented by other members of the Sony Optiarc group of Defendants.

45.     Defendants SC, SEI, Sony Optiarc America Inc., Sony NEC, and Sony Optiarc Inc. are referred to individually and collectively herein as "Sony."  All of the entities referred to as Sony participated in the collusive conduct described herein, either directly or as represented by other members of the Sony group of Defendants.

### 6.  Toshiba Defendants

46.     Defendant Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corporation controls an integrated global enterprise comprising itself and other entities, including Toshiba Samsung Storage Technology Corporation, Toshiba

13

Samsung Storage Technology Corporation Korea, Toshiba America Information Systems, Inc. ("TAIS") and Toshiba America Consumer Products LLC ("TACP"). During the Relevant Period, Toshiba Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

47.     Defendant TAIS is a California corporation that has its headquarters at 9740 Irvine Blvd, Irvine, California 92718-1697. TAIS is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is in turn a wholly owned subsidiary of Toshiba Corporation. During the Relevant Period, TAIS manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. During the Relevant Period, TACP also manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States. TACP was merged into TAIS on July 1, 2010. Toshiba Corporation's 2009 Annual Report contains a letter from Norio Sasaki (President and CEO of Toshiba Corporation) and Atsutoshi Nishida (Toshiba Corporation's Chairman) that refers to the "Toshiba Group" and its "Group-wide efforts" to carry out a profitability action plan "set up with the key objectives of transforming Toshiba Group into a Group with a strongly profitable business structure . . . ." The Annual Report depicts an organization chart that shows Toshiba Corporation's board and President and CEO exercising control and reporting authority over multiple product segment subgroups, including the "Digital Products Group," which has responsibility for storage devices and personal computers. The Annual Report lists Toshiba Samsung Storage Technology Corporation and TAIS as overseas "Consolidated Subsidiaries." Toshiba Corporation's 2009 Financial Review incorporated in its Annual Report noted that the Toshiba Group comprised Toshiba Corporation and various "Consolidated Subsidiaries" that operate in its multiple business segments.

48.     Defendants Toshiba Corporation and TAIS (which now includes the merged TACP) are referred to individually and collectively herein as "Toshiba." All of the entities referred to as Toshiba participated in the collusive conduct described herein, either directly or as represented by other members of the Toshiba entities.

14

### 7. Samsung Defendants

49.     Defendant Samsung Electronics Co. Ltd. ("SECL") is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main Building 250, Taepyeongno 2-ga, Jung-gu, Seoul 100-742, Korea. SECL controls an integrated global enterprise comprising itself and other entities, including Toshiba Samsung Storage Technology Corp. and Toshiba Samsung Storage Technology Corp. Korea. During the Relevant Period, SECL manufactured, sold and/or distributed ODDs and ODD Devices throughout the United States and directly caused ODDs and ODD Devices to be imported into the United States.

50.     Defendant Samsung Electronics America, Inc. ("SEAI") is a subsidiary of SECL, with its principal place of business at 105 Challenger Rd., Ridgefield Park NJ 07660. During the Relevant Period, SEAI manufactured, sold and/or distributed ODDs and ODD Devices throughout the United States and imported ODDs and ODD Devices into the United States.

51.     SECL's 2008 Annual Report contains an organizational chart depicting the tight control SECL exercises over its various business segments, with the "Digital Media & Communications Business" reporting directly to SECL's CEO. SECL touts its "board-centered corporate governance system" that ensures "accountability in management"; "the board actively supports top management in effectively managing the company to maximize corporate value." SECL runs a "Samsung Advanced Institute of Technology"—the "global hub of our R&D business." The independent auditor's report incorporated in the Annual Report refers to SECL and its "controlled subsidiaries" as "the Company." SEAI is among them.

52.     Defendants SECL and SEAI are referred to individually and collectively herein as "Samsung." All of the entities referred to as Samsung participated in the collusive conduct described herein, either directly or as represented by other members of the Samsung entities.

15

DELL'S COMPLAINT

### 8.  TSST Defendants

53.    Defendant Toshiba Samsung Storage Technology Corporation is a business entity organized under the laws of Japan with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan (the same address as Toshiba's). Toshiba Samsung Storage Technology Corporation is a joint venture formed in 2004 and owned 51% by Toshiba and 49% by Samsung.  During the Relevant Period, Toshiba Samsung Storage Technology Corporation manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

54.    Defendant Toshiba Samsung Storage Technology Corporation Korea ("TSST Korea") is a business entity organized under the laws of South Korea with its principal place of business located at 14th Floor, Building No. 102, Digital Empire 2, 486, Sin-dong, Yeongtong-gu, Suwonsi, Gyonggi-do, Korea 443-734, which is part of the Samsung Digital Complex.  In its 2009 Annual Report, Toshiba lists TSST Korea as an overseas subsidiary. During the Relevant Period, TSST Korea manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. TSST Korea's website notes that it operates through the "common relevant organization for mutual consent.  We are currently responsible for the product development, marketing and sales, and have been taking advantage of the existing network of Samsung Electronics and Toshiba for manufacturing, sales and after-sales service."  The website notes further that "TSST is the result of close cooperation between Samsung Electronics and Toshiba."

55.    Defendants Toshiba Samsung Storage Technology Corporation and TSST Korea are referred to individually and collectively herein as "TSST."  TSST has operated or currently operates sales offices in North America and Logistics Centers in Miami, Florida and San Diego, California.  All of the entities referred to as TSST participated in the collusive conduct described herein, either directly or as represented by other members of the TSST entities.

56.    The conduct alleged herein was carried out by Defendants' and the co-

16

conspirators' officers, agents, employees, or representatives, while engaged in the usual management of their business.

57.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

58.    When Dell refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Dell is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts on behalf of every company in that family.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families.  As a result, the entire corporate family was represented by their agents with respect to such conduct and was party to the agreements reached by such agents.

59.    Each of the Defendants named herein acted as the agent of, co-conspirator with, or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant or co-conspirator that is a subsidiary of a foreign parent acts as the United States agent for ODDs made by its parent company.

## IV.    AGENTS AND CO-CONSPIRATORS

60.    The acts alleged against the Defendants and co-conspirators in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' and co-conspirators' businesses or affairs.

61.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, other Defendants or co-conspirators with respect to the acts, violations, and common course of conduct alleged by Dell.  Each Defendant and co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for ODDs made by its parent company.

17

62.    Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. These co-conspirators are believed to include Sharp Corporation; Pioneer entities; TEAC entities; and Quanta entities as described below.

63.    Co-conspirator Sharp Corporation ("Sharp") is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545- 8522, Japan. During the Relevant Period, Sharp manufactured, sold, and/or distributed ODDs to customers throughout the United States and directly caused ODDs to be imported into the United States.

64.    Co-Conspirator Pioneer Corporation ("Pioneer") is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Relevant Period, Pioneer manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

65.    Co-conspirator Pioneer North America, Inc. ("Pioneer N.A.") is a U.S. company with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. During the Relevant Period, Pioneer N.A. designed, manufactured and/or distributed ODDs throughout the United States. Pioneer N.A is a wholly-owned subsidiary of Pioneer.

66.    Co-conspirator Pioneer Electronics (USA) Inc. ("Pioneer USA") is a U.S. company with its principal place of business at 1925 E Dominguez Street, Long Beach, California 90810. During the Relevant Period, Pioneer USA designed, manufactured and distributed ODDs throughout the United States. Pioneer USA is a wholly owned subsidiary of Pioneer N.A.

67.    Co-conspirator Pioneer High Fidelity Taiwan Co., Ltd. is a Taiwanese company with its principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan, Republic of China. During the Relevant Period, Pioneer High Fidelity Taiwan

18

Co., Ltd. designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

68.    Co-conspirator Pioneer Digital Design & Manufacturing Company ("PDDMC") is a joint venture owned 66% by Pioneer and 34% by Sharp. It is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa 212-0031, Japan. During the Relevant Period, PDDMC manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

69.    Co-conspirator LG Electronics Inc. ("LGE") is a business entity organized under the laws of South Korea, with its principal place of business at 26/F Twin Tower South 20, Yeouido-Dong, Yeoungdeungpo-Gu, Seoul, SEO 150-721, South Korea. LGE controls an integrated global enterprise comprising itself and other entities, including Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea, Inc. During the Relevant Period, LGE manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

70.    Co-conspirator LG Electronics USA, Inc. ("LGUSA") is a business entity that has its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. LGUSA is a wholly owned subsidiary of LGE. During the Relevant Period, LGUSA manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

71.    Co-conspirators LGE and LGUSA are referred to individually and collectively herein as "LG." All of the entities referred to as LG participated in the collusive conduct described herein, either directly or as represented by other members of the LG entities.

72.    Co-conspirator TEAC Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo 206-8530, Japan. TEAC Corporation controls an integrated global enterprise comprising itself and other TEAC entities. During the Relevant Period, TEAC Corporation manufactured, sold and/or

19

distributed ODDs throughout the United States and caused ODDs to be imported into the United States.

73.    Co-conspirator TEAC America, Inc. ("TEAC America") is a California corporation with its principal place of business at 7733 Telegraph Rd., Montebello, California 90640. TEAC America is a wholly owned and controlled subsidiary of co-conspirator TEAC Corporation. During the Relevant Period, TEAC America manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

74.    Co-conspirators TEAC Corporation and TEAC America are referred to individually and collectively herein as "TEAC." All of the entities referred to as TEAC participated in the collusive conduct described herein, either directly or as represented by other members of the TEAC group of co-conspirators.

75.    Co-conspirator Quanta Storage, Inc. is a business entity organized under the laws of Taiwan, with its principal place of business at 3F NO.188 Wenhua 2nd Rd., Guishan Shiang, Taoyuan County 333, Taiwan. Quanta Storage, Inc. controls an integrated global enterprise comprising itself and other Quanta entities. During the Relevant Period, Quanta Storage, Inc. manufactured, sold and/or distributed ODDs throughout the United States and directly caused ODDs and to be imported into the United States.

76.    Co-conspirator Quanta Storage America, Inc. ("Quanta America") is a California corporation with its principal place of business in Fremont, California. Quanta America is a wholly owned and controlled subsidiary of co-conspirator Quanta Storage, Inc. During the Relevant Period, Quanta America manufactured, sold and/or distributed ODDs throughout the United States and imported ODDs into the United States.

77.    Co-conspirators Quanta Storage, Inc. and Quanta America are referred to individually and collectively herein as "QSI." All of the entities referred to as QSI participated in the collusive conduct described herein, either directly or as represented by other members of the QSI group of co-conspirators.

78.    Dell's investigation into the identities of co-conspirators is ongoing and Dell

reserves the right to identify additional co-conspirators in discovery and expert reports in this matter. On information and belief, other partnerships, corporations, or business entities are co-conspirators with Defendants in their unlawful restraint of trade.

79.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## V.    TRADE AND COMMERCE

80.    During the Relevant Period, each Defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

81.    During the Relevant Period, Defendants and their co-conspirators collectively imported at least tens of millions of ODDs into the United States.

82.    During the Relevant Period, Defendants and their co-conspirators collectively controlled a majority of the market for ODDs, globally, in the United States, and within this district.

83.    The business activities of Defendants and their co-conspirators substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

84.    Defendants and their co-conspirators sell their ODDs through various direct channels, including to manufacturers of electronic products and devices such as Dell.

## VI. FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY

### A.  ODD Technology

85.    Optical discs contain microscopic pits where data are stored. These pits are made from a crystalline metal alloy and are usually pressed into the disc in a spiral

21

arrangement, starting at the center of the disc. Once a disc containing information is inserted into the ODD, the disc spins while a lens inside the device guides a semiconductor laser beam over the disc and a photodiode detects the light reflected from the disc's bumps and pits. The laser moves outward from the center of the disc, scanning over the disc's surface. Then the photodiode reads the light's reflection as a binary code—a series of ones and zeros—that the computer translates into usable data. Changes in the intensity of the beams as the lasers hit the pits are detected and translated into electrical signals. The more pits that can be packed onto the disc, the more data the disc can store. Reading the different disc formats requires the ODD to have lasers of different wavelengths. BD players use a shorter wavelength laser, which is blue-violet, to read discs. Additional layers can be added to the disc as well, increasing storage capacity. In addition to reading discs, ODDs can write and rewrite on the disc, depending on the technology of the drive and accompanying disc.

86.    When a recordable disc is inserted into an ODD that has the ability to record data, the ODD's laser is used to heat selectively parts of the organic photosensitive dye layer. By exposing the disc to light with the laser, the reflective properties of the disc's surface change, which causes the photodiode to recognize these changes as bumps and pits and read the new information on the disc.

87.    ODDs include half height ("HH"), slim and ultraslim models. HH ODDs are thicker and generally incorporated into desktop computer towers. Slim and ultraslim ODDs are thinner and generally incorporated into laptop computers. As laptop computers have become more popular with consumers, demand for slim and ultraslim ODDs has increased.

88.    The back end of the ODD typically contains a port for a cable that connects to the motherboard and a connection for power from the power supply. ODDs connect to the motherboard of a computer through either a Serial Advanced Technology Attachment ("SATA") or Parallel Advanced Technology Attachment ("PATA") interface. Where the ODD is intended for external use with a computer, it is connected to the computer through some type of interface, such as a USB connection.

22

DELL'S COMPLAINT

89.    The following table provides an overview of the names, sizes and capabilities of the main optical disc media standards that existed during the Relevant Period.

| Overview of Optical Disc Media Standards | | |
|---|---|---|
| **Drive Standard** | **Capacity**[a] | **Capability** |
| CD-ROM | 700 MB | Read Only |
| CD-R | 700 MB | Read, Write |
| CD-RW | 700 MB | Read, Write, Rewritable |
| DVD-ROM | 4.7 GB | Read Only |
| DVD-RAM | 4.7 GB | Read, Write |
| DVD-R[b] | 4.7 GB | Read, Write |
| DVD-RW[b] | 4.7 GB | Read, Write, Rewritable |
| BD-ROM | 25 GB Single Layer; 50 GB Dual Layer | Read Only |
| BD-R | 25 GB Single Layer; 50 GB Dual Layer | Read, Write |
| BD-RW | 25 GB Single Layer; 50 GB Dual Layer | Read, Write, Rewritable |
| [a] These are standard capacities. Depending on the number of layers, or if the disc can be read double-sided, the capacity will be larger. [b] There are other DVD standards such as DVD+R/RW, which include other features or improvements. | | |

## B.  Evolution Of ODDs And Sales

90.    The optical disc was invented in 1958. In 1961 and 1969, patents were registered for the analog optical disc for video recording. In 1969 Royal Philips began its first optical videodisc experiments. The first ODD was invented with the creation of the audio compact disc (audio CD), which was jointly invented by Sony and Royal Philips and intended to store analog video signals and music and computer software. In 1972, Royal Philips announced a technique for storing audio recordings on an optical disc with a small diameter. At the same time, Sony was exploring optically recording audio on a larger disc but was focusing on developing an error correction technique. In 1978, Sony and Royal Philips agreed

DELL'S COMPLAINT

on a single format for the disc and the error correction method that would be used. The CD system was introduced to the public in Japan and Europe in 1982. Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards set by Sony and Royal Philips.

91.    The first generation of ODDs utilized CDs that could store 650 megabytes of data, but for several years, the CDs were available only in a read-only format (CD-ROMs). Once the standard of how to create a CD and an optical device that reads the information on the CD were established, CD-ROM drives began to penetrate the computer market. ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer. Both HLDS and TSST stopped making CD-ROM drives and CD-RW drives at the beginning of 2008.

92.    In the mid-1990s, a consortium of manufacturers (including Hitachi, Pioneer Royal Philips, Sony and Toshiba) developed the second generation of the optical disc, the DVD. The second generation of drives used DVDs that could store 4.7 gigabytes, but DVDs were more quickly available in both a read-only format and a format that allowed both reading and recording. The DVD was intended to store great amounts of data, including broadcast-quality digital video. ODDs using DVDs are currently the most prevalent in both consumer electronics products and computers.

93.    The third generation of ODDs uses BDs that can store in excess of 20 gigabytes, and also have both read-only and read/record formats. Toshiba developed and promoted an HD-DVD format for third generation ODDs, but in June of 2008, it announced that it would no longer develop or manufacture ODDs using HD-DVDs, and would instead use the BD format developed and promoted by Sony. In 2006, the specifications for the third generation optical disc, the BD format, were finalized. The Blu-ray standard was developed by the Blu-ray Disc Association, an industry group which included makers of consumer electronics, computer hardware, and motion pictures. The Blu-ray format was designed to supersede the DVD format and dramatically improve on the quality and capacity of the DVD.

24

The BD was meant to be able to distribute high-definition video and support greater data storage capacity than the DVD. Afterwards, manufacturers began to develop ODDs for computers that could read and write both DVDs and BDs.

94. The latest ODDs, which can read from and write and rewrite onto all kinds of optical discs and are thus fully backward compatible, are known as "super multi-drives."

95. Throughout its history, but especially after 2000, the ODD market, which requires significant technical resources and advanced manufacturing capabilities, has been dominated by a small group of manufacturers, as discussed in further detail below.

96. The ODD market has also consistently been faced with downward pricing pressures, including those resulting from the technological advances in ODD technology described above. As the Defendants and their co-conspirators improved their ability to manufacture ODDs more efficiently and at a lower cost, the price of this technology began to decline. To arrest this competitive dynamic, the Defendants and their co-conspirators colluded to fix and stabilize prices and to allocate markets or customers.

97. During the Relevant Period, ODDs were a standard component on computers in the United States. Due to the increasing popularity of personal computers during the Relevant Period, Defendants and their co-conspirators shipped hundreds of millions of ODDs each year, generating billions of dollars in annual revenues. According to an analysis by IDC, an industry data source, between 2004 and 2008, worldwide ODD shipments generated more than $45 billion in revenues.

98. The Defendants and their co-conspirators have remained market leaders because of their collusive conduct. Although the market for CDs has decreased, the market for DVDs and BDs has grown exponentially as consumers have shifted to the new formats.

**C. Structural Market Factors Favoring, And Acts Indicative Of, Collusion**

99. During the Relevant Period, the ODD market exhibited several factors that contributed to the ability of Defendants and their co-conspirators to carry out their conspiracy, including but not limited to: (1) market concentration; (2) joint venture or other collaborations;

DELL'S COMPLAINT

(3) significant barriers to entry (including patent pools); (4) common trade associations and business organizations; and (5) the standardization of ODDs.

### 1. Market Concentration

100. The ODD market is highly concentrated and dominated by a small group of suppliers. This concentrated market is conducive to and facilitates the collusive conduct alleged herein. On information and belief, HLDS, TSST, Sony Optiarc, PLDS/PBDS and other defendants and co-conspirators controlled more than 90% of the market.

### 2. Joint Venture or Other Collaboration

101. The ODD industry has experienced significant consolidation. As manufacturing migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early Japanese manufacturers still held key competitive advantages in the form of intellectual property rights. To mitigate the high cost of royalty payments for licensing this intellectual property, Taiwanese and Korean defendants partnered with the patent holders through strategic alliances and joint ventures. These alliances include:

a. HLDSI, formed on November 1, 2000 in Tokyo, Japan, and beginning operations in January 2001;

b. JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing company founded in October of 2001 in Hong Kong;

c. PBDS, founded in February of 2003 and specializing in the manufacture of DVD+RW ODDs;

d. The Sony & Lite-On "Alliance", a memorandum of understanding signed in May of 2003 that led to acts of price-fixing of ODDs;

e. TSST, established in April of 2004;

f. The Sony-NEC joint venture, formed in 2006, which was followed by NEC's transfer of its stock to Sony in September of 2008;

g. Lite-On's acquisition of BenQ's ODD production facilities in 2006;

h. Philips & Lite-On Digital Solutions Corporation, formed in March of 2007; and

26

i.  PDDMC, the joint venture between Pioneer (which owned 66%) and Sharp (which owned 34%) that was announced in June of 2009 and anticipated to commence operations in October of 2009 (but was delayed "due to ongoing assessments of whether the joint venture conforms to antitrust laws overseas"), and which was finalized in November of 2009.

102.  The mutually beneficial nature of the business relations between and among certain Defendants and co-conspirators provided the opportunity for their parent entities to conspire and created a financial incentive to do so. As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because "[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."

103.  Similarly, on information and belief, after the formation of PLDS, the company's general manager, Tseng Huan-Xiong, stated that "[Royal] Philips and Lite-On in the future will target at making profits and avoid price wars." "While aiming for large shipment volumes, PLDS will maintain steady profits and therefore will maintain a minimum gross margin by refusing low-priced orders as well as not participating in price-cutting competition, Tseng pointed out."

104.  In addition, at various points during the Relevant Period, one Defendant or co-conspirator produced ODDs for another Defendant or co-conspirator. For example, on information and belief, in November of 2004, it was reported that Lite-On would produce more non-Blu-ray ODDs for Sony. As another example, in 2000, TEAC entered into an ODD co-development arrangement with Royal Philips. As a third example, QSI has manufactured ODDs for PLDS/PBDS and Sony Optiarc.

105.  These joint ventures and collaborations among the Defendants and their co-conspirators enabled them to force out most of Taiwan's second-tier manufacturers and almost all Chinese manufacturers from the ODD industry. This latter result was anticompetitive because the Chinese manufacturers had lower labor costs, a market reality that normally would

27

enable a manufacturer to drive down prices on products such as ODDs.

### 3. Barriers to Entry

106.   The market for the manufacture and sale of ODDs was subject to high manufacturing and technological barriers to entry during the Relevant Period. Efficient manufacturing plants are large and costly. Companies, such as Defendants and their co-conspirators, that develop and manufacture ODDs, face technological advances, causing the companies to undertake significant research and development expenses.

107.   Finally, Defendants and their co-conspirators belong to or control patent pools that effectively deter entry into the ODD market by imposing high licensing costs on required technology. These pools include the 3C DVD Patent Group (exploiting patents related to the DVD format), the similar DVD 6C Patent Pool, the DB4C Licensing Group (covering Blu-ray format), and several patent pools relating to CD technology.

108.   The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion. To facilitate patent licensing to CD-R producers around the world, Royal Philips, Sony and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden first licensed their patent rights to Royal Philips, and then Royal Philips bundled the rights together for licensing to other companies. In a decision entered in December of 2008, the Taiwanese Fair Trade Commission ("TFTC") concluded that these companies engaged in unlawful "concerted action," improperly excluded competitors from the market and overcharged patent licensees. As stated on TFTC's website:

> After considering the unlawful acts' impact on the functioning of market mechanisms of the technology patent licensing markets and associated products at issue, as well as the respondents' motives for the violation, benefits obtained thereby, and considerable business scales and prominent market standing, the [T]FTC imposed administrative fines of NT$ 8 million on Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices pursuant to the fore part of Article 41 of the [Taiwanese Fair Trade Law].

109.   Because of the barrier to entry caused by onerous patent royalties, efficient

Taiwanese and Korean manufacturers that could not otherwise thrive in the ODD market formed joint ventures with less efficient manufacturers holding intellectual property rights. The ODD market thus increasingly coalesced around an oligopoly consisting of Sony NEC (later Sony Optiarc), HLDS, TSST, and PBDS (later PLDS). On information and belief, an analyst report in 2003 noted that "the collective market share of this group will swell further to about 80%-90% over the next two years." That is what happened during the Relevant Period, and the conspiracy has controlled prices for ODDs.

### 4. Trade Associations and Business Organizations

110.    Various industry trade organizations or events facilitated Defendants' and their co-conspirators' price fixing of ODDs. Defendants participated in many of these meetings and events and provided a forum at which Defendants and their co-conspirators could discuss and exchange information with respect to the pricing and production of ODDs with the purpose and effect of raising, fixing and stabilizing the prices of such products, bid rigging and market allocation. In several instances, these trade association meetings preceded examples of alleged collusive pricing conduct described below. Some examples of the trade association meetings are as follows:

- CD Trade Associations – CDs21 (including HLDS, Sony, Lite-On, TSST and Royal Philips Japan Co., Ltd.)

- DVD Trade Associations – DVD Forum (including Hitachi, LG, Lite-On, NEC, Royal Philips, Pioneer, Samsung, Sony, TEAC, QSI, and Toshiba); Recordable DVD Council (including Hitachi, Samsung, and Toshiba); RAM Promotion Group (including TEAC, HLDS, LG, Toshiba, and Samsung); and DVD+RW Alliance (including Sony and Royal Philips).

- Multi-Format Trade Associations – Optical Storage Technology Association, or "OSTA" (including Sony, LG, Toshiba, Philips Electronics, Samsung Electronics, and Pioneer); International Symposium of Optical Memory (including Sony, Sharp, Toshiba, Hitachi, LG, NEC and Samsung); RW Products Promotion Initiative (including LG, Pioneer,

Sharp, Sony, Samsung, Lite-On, NEC, TSST and Sony Optiarc).

111.    These industry groups held numerous meetings during the Relevant Period, that provided a forum to communicate and agree upon prices for ODDs and carry out the conspiracy relating to them.

112.    The International Consumer Electronics Show ("CES"), the world's largest consumer electronics show, has been held annually during the Relevant Period.

113.    The Optical Storage Symposium is a worldwide conference held annually from 2001-07 at various locations that was sponsored by OSTA. The 2007 event was held in South San Francisco on September 18-19, 2007. The 2006 event, held in Tokyo, Japan on October 5, 2006, included presenters from Sony, Hitachi and CDs21. The 2004 event, held in Burlingame, California on September 25, 2005 and co-sponsored by, among others, Sony and Toshiba, included presenters from Sony and Toshiba.

114.    The Internationale Funkausstellung ("IFA") is a worldwide exhibition of consumer electronics products that is held annually in Berlin, Germany and is attended by representatives of Defendants.   Recent IFA shows occurred on September 3-8, 2010; September 4-9, 2009; August 29- September 3, 2008; August 31-September 5, 2007; September 1-6, 2006; and September 2-7, 2005 and September 3-8, 2010.

115.    The conduct of the "business" of these organizations or events gave Defendants and their co-conspirators the cover needed to contact one another to communicate competitive information and reach and/or implement anticompetitive agreements.

### 5. Standardization of ODDs

116.    A product is considered standard across suppliers when there is a high degree of substitutability among different suppliers in the market. When products are viewed as interchangeable by purchasers, it is easier to agree on a single price for the good in question and to effectively monitor those prices. Standardization makes it easier to form and sustain a conspiracy. As part of the conspiracy, Defendants and their co-conspirators standardized products in the ODD market.

30

117.    The ODD market has been typified by standardization of ODDs driven by market participants and a variety of industry-related organizations such as ECMA International, the International Organization for Standardization ("ISO"), and the International Electrotechnical Commission.  These organizations and their members are dedicated to "standardizing the use of information and communication technology and consumer electronics."

118.    As noted above, the ODD market is also subject to patents and intellectual property rights, which are utilized to require adoption of standardized product specifications.

119.    The standardization of the ODD market provided Defendants and their co-conspirators with the mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs.  As a result of this standardization, ODDs are commodity products, and buyers make decisions to purchase such products based largely on price.  As one market analyst noted in a treatise on optical and magnetic storage, on information and belief, "[a]s with DRAM chips, the market for magnetic and optical drives is a commodity one; brand name matters little if at all. . . .  Optical drives are provided by consumer appliance companies, mostly Japanese, Korean and Taiwanese."  Likewise, on information and belief, Kris Williams of NEC, in a 2006 e-mail, referred to "commodity products like DVD-ROM and CD-RW."

### D.    Acts of Collusion With Respect To ODDs

120.    Defendants and their co-conspirators reached agreements, the object of which was to stabilize the prices for ODDs in numerous ways throughout the Relevant Period.

121.    Defendants and their co-conspirators participated in meetings, discussions, and communications in the United States or elsewhere to discuss bidding strategies and prices of ODD. During those meetings, discussions, and communications, Defendants and their co-conspirators reached agreements regarding prices to charge customers for ODDs and how participants would bid on ODDs, including prices and bids to Dell.  Defendants and their co-conspirators submitted bids and prices in accordance with the agreements reached during those meetings, discussions, and communications.

31

122.   In November 2011, HLDSI pled guilty in the Northern District of California to conspiring to fix prices and rig bids for ODDs sold to Dell, HP, and Microsoft, and agreed to pay a $21.1 million criminal fine.  HLDSI admitted that its officers and employee engaged in discussions and meetings with representatives of other major sellers of ODDs.  During these discussions and meetings, HLDSI reached agreements to fix prices of ODDs and to rig ODD internet negotiations.  HLDSI specifically admitted to conspiring to rig bids for Dell ODD internet negotiations in June 2004, August 2004, September 2004, November 2004, March 2005, February 2009, and May 2009.

123.   The HLDSI criminal information charged that HLDSI rigged Dell bids for 48x Combo drives from June to September 2004.  At least HLDS and TSST supplied Dell 48x Combo drives around the time the bids were rigged.

124.   The HLDSI criminal information charged that HLDSI rigged Dell bids for half-height CD-RW drives from August to December 2004.  At least HLDS, Sony, and TSST supplied Dell half-height CD-RW drives around the time the bids were rigged.

125.   The HLDSI criminal information charged that HLDSI rigged Dell bids for Slim 24x Combo drives from September to December 2004.  At least HLDS, Sony, PLDS (then PBDS), and TSST supplied Dell Slim 24x Combo drives around the time the bids were rigged.

126.   The HLDSI criminal information charged that HLDSI rigged Dell bids for half-height DVD-ROM drives from November 2004 to February 2005.  At least HLDS, PLDS (then PBDS), TSST, and Sony supplied Dell half-height DVD-ROM drives around the time the bids were rigged.

127.   The HLDSI criminal information charged that HLDSI rigged Dell bids for Slim CD-ROM drives from March to June 2005.  At least HLDS, TSST, and TEAC supplied Dell Slim CD-ROM drives around the time the bids were rigged.

128.   The HLDSI criminal information charged that HLDSI rigged Dell bids for half-height SATA Tray DVD-RW drives from February to July 2009.  At least HLDS, PLDS, TSST, and Sony supplied Dell half-height SATA Tray DVD-RW drives around the time the

32

bids were rigged.

129.    The HLDSI criminal information charged that HLDSI rigged Dell bids for half-height DVD-RW drives from May to September 2009.  At least HLDS, PLDS, TSST, and Sony supplied Dell half-height DVD-RW drives around the time the bids were rigged.

130.    The HLDSI criminal information charged that HLDSI rigged Dell bids for 12.7 mm Tray DVD-RW drives from May to September 2009.  At least HLDS, PLDS, TSST, Sony, and TEAC supplied Dell half-height SATA Tray DVD-RW drives around the time the bids were rigged.

131.    Additionally, the following HLDSI executives individually pled guilty to participating in the conspiracy: Young Keun Park, Sang Hun Kim, Woo Jin Yang, and Sik Hur.  Each of the executives was ordered to pay a $25,000 fine and also received a jail sentence.  From 2005 through 2009, Young Keun Park was the HLDSI executive responsible for the Dell account.  From approximately February 2009 to approximately July 2009, Sang Hun Kim was the Deputy Chief Marketing Officer of HLDSI and Team Leader in charge of the Dell HLDSI account.

132.    Pursuant to their price-fixing conspiracy, Defendants and their co-conspirators exchanged confidential business information concerning ODDs, prices charged and to be charged for ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, confidential roadmaps for product rollouts and production, confidential product quality information, confidential product inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles.

133.    Upon information and belief and review of the pleadings in the *In re Optical Disk Drive Products Antitrust Litigation*, 3:10-md-02143 consolidated litigation, to date, certain Defendants and their co-conspirators have already produced more than 4 million documents that contain information regarding Defendants' and their co-conspirators' confidential information exchanges and agreements.

33

DELL'S COMPLAINT

134.    The patent pools described previously also facilitated the operations of the price-fixing conspiracy. They restricted competition among pool members and, as reflected in the CD-R patent pool involving Royal Philips, Sony, and Taiyo-Yuden described above, operated as a vehicle to unlawfully fix prices. For example, licensees from the 3C DVD Patent Group and DVD 6C Patent Pool, on information and belief, had to report customer, sales and pricing data to those pools, thus ensuring that the co-conspirators who operated them can have access to sensitive non-public commercial information that facilitated the conspiracy. For example, the license agreement for the DVD 6C Patent Pool specifically required the patent licensee to agree that such information could be shared among the members of the licensing group.

135.    The following paragraphs reflect representative actions of Defendants and co-conspirators in engaging in a price-fixing conspiracy, including exchanging pricing, supply, capacity, quality and bid positioning information with their competitors, and are presented on information and belief. These actions show an agreement to stabilize ODD prices, and actions that facilitated that price stabilization.

136.    The Defendants and co-conspirators exchanged competitively sensitive information through e-mail communications, telephone calls, and face-to-face meetings. The exchanges were directed by customer account managers and sales directors at the Defendants and co-conspirators. These account managers and sales directors exchanged personal cell phone numbers and email addresses with their rival ODD suppliers to facilitate the conspiracy, and the contacts were so important that employees, when switching jobs, would introduce their replacements to their contacts at rival ODD suppliers.

137.    In February 2004, Luke Choi of LG e-mailed HLDS employees (including hjungchoi@hlds.co.kr), addressing them as "Dell Team." Mr. Choi relayed there would be an additional round of bidding on a Dell internet negotiation. Mr. Choi reported that "Philips, Samsung, Teac are expected not to join. During phone call with PMs on today, it is verified that they have no room for more price cutting."

DELL'S COMPLAINT

138.    In June 2004, Luke Choi of LG e-mailed HLDS employees regarding a Dell procurement event that was to occur the next day, reporting that he had spoken with Samsung and Samsung had proposed that the competitors alternate rankings in upcoming Dell internet negotiation: "Samsung's PM suggested as follows: Since HLDS and Samsung are only two suppliers for HH Combo, HLDS takes 1st rank in one of August or September and Samsung takes 1st rank in the other month. (In this case, Dell might notice it so I am quite cautious about this, what about your opinion?)"

139.    In August 2004, Luke Choi of LG e-mailed the HLDS "Dell Team" regarding an upcoming Dell internet negotiation.  Mr. Choi discussed his intention to "pre-negotiate" regarding the procurement event with Samsung, wherein they would agree to alternate taking first place in rank.  According to the e-mail, Samsung was amenable to the agreement: "Quantity status up to today presented to have insufficient operate quantity even if it received JE8 material again.  When you send nego point, considering the recent quantity status, I will negotiate with Samsung in Monday afternoon.  (Samsung's PM suggested us to take 1st rank for one month and it takes 1st rank for two month in CD-RW since HLDS took 1st rank all in DVD-ROM)."

140.    A May 2006 e-mail from Eugene Yang of HLDS to Daniel Hur of HLDS requested competitors' contact information.  In response, Mr. Hur acknowledged the illegal nature of the competitor contacts and explained to Mr. Yang that he should meet his competitors at "a place where it would be very unlikely for [the customer's] people to see you" and suggesting using Starbucks "but that does not meet [sic] those places are guaranteed to be safe."

141.    In October 2007, Hyun Chul Son reported to a number of HLDS employees, including Daniel Hur: "I've checked it through Freddie, SNO's DVD-ROM isn't supported from Lite-on. This model is produced by Foxconn as OEM and supply to SNO." On information and belief, the "Freddie" referred to by Mr. Son is Freddie Hsieh of Lite-On/PLDS, and SNO refers to Sony NEC Optiarc.

35

142.   In February 2009, internal HLDS e-mails again acknowledged that the competitor contacts were improper given government investigations in other industries, but then counseled employees to simply keep these contacts out of documents or e-mails:

> Recently in the USA & EU, investigations on collusion between suppliers are being strengthened. LG TV & LGD are under the investigation as a close example. I guess other industries also know this thru news or something. With competitor, especially T company, we need to be extremely careful about contacts, and let's be careful so that there are not should in documents / email. (since the share of T and us combined becomes more than 50%, there is a chance that the issue will grow even bigger). Recently, HE President and CEO emphasized this again.

On information and belief, the "T company" and "T" referred to in the above e-mail is TSST.

143.   In March 2009, Daniel Hur of HLDS e-mailed Eugene Yang of LG among others encouraging his colleagues to further mask their competitive contacts:

> I would like to suggest using phones where only out-going calls can be made instead of our cell phones that we use for business purposes in order to avoid any unnecessary misunderstanding or misapprehension when gathering market intelligence.

144.   In May 2008, at a time when Quanta was acting as a manufacturing partner with Sony Optiarc, Haw Chen of Quanta e-mailed Shu-ming Tzeng of Quanta to report he had spoken with Jerry Hsieh of PLDS regarding an upcoming Dell procurement event. He reported: "Jerry said SATA RW price, TSST and HLDS is around $24.6, PLDS keep high at $27. But my phone is quite noisy. I am sure $24.6 of TSST, not sure about 27 of PLDS. Need to check again. He say the [Total Available Market ("TAM")] is only hundred or something thousands. In that case, our PATA can keep as high as possible."

145.   In October 2008, Caroline Lin of Quanta e-mailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san." On information and belief, the e-mail

36

subject referred to Amino Masafumi from Sony Optiarc. Quanta and Sony Optiarc were to act as partners in an upcoming ODD procurement event. Ms. Lin of Quanta reported that, "I'll have dinner w/HLDS Eugene [Yang, on information and belief] this Friday evening and get the consensus on the price protection."

146.    The following Monday, Ms. Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen that "Last week, I met HLDS guy. According to what he said, their best price is around 24.65 eventually. However, the [sic] they won't go that far in the 1st round as well and might provide a higher price to see [the customer]'s feedback & then react."

147.    In December 2004, "h-moriwaki@az.jp.nec.com" e-mailed Kris Williams, the Dell Account Manager for NEC Solutions (America), among others, and described his dinner with a Sony senior manager and the exchange of competitive information regarding ODDs:

> I had a dinner with Sony senior manager (same as my position) last night and had some information about DVD Burden slim. According to Sony, their monthly capacity is limited to about 140k/month due to OPU supply from Sanyo. 40-60k out of 140k is allocated to Dell currently. Sony's low cost version will start its MP in April next year, and that is exactly same as our MP timing. We need to be very careful to compete Sony on 2nd generation of 8x Slim. In addition, Sony mentioned that Dell is still planning to have 3rd Slim vendor. Possibly HLDS or TSST. If so, it is very critical for us, and should work carefully to avoid 3rd vendor at Dell.

148.    In July 2005, Hank Hayami of NEC e-mailed to NEC employees (including NEC employee Glenn Brower) that "when our [NEC's] top management met TSST top management last week, TSST clearly mentioned as below. . . ." The e-mail went on to discuss a number of sensitive issues regarding ODD products:

> 1) For Dell Slim
>
> TSST is using OPU made by Sharp for Slim DVD and the horogram inside OPU caused a technical trouble of double layer. TSST dispatches engineers

37

to Sharp OPU production lines to find out any rootcause, but due to this issue, the current yield rate is low and TSST could not find any solution yet According to TSST, since Sharp CPU business is becoming a minus P/L impact, Sharp decided to shift key enginees resources to Brd Division. This is one of the biggest reason on why the above issue happened. From TSST standpoint, they would like to ask NEC to support Dell in supply more strongly, because TSST cannot afford to supply enough to Dell.

The information was received by Kris Williams of NEC who stated that he had "a good contact at Toshiba, and I will contact him tomorrow. I will also provide the yield rate at Sharp factory and TSST (Samsung) drive factory on the new lead-free slim 8X DVDRW."

149.    In April 2006, Kris Williams of NEC reported that Dell had requested that all suppliers start their bid for the month of June 2006 at $1.20 lower than their May pricing. Williams went on to explain that "I was contacted by all the other Account Managers to Dell about this mandatory bidding and none of the other suppliers are going to participate with the mandatory $1.20."

150.    In August 2006, Kris Williams e-mailed Sony NEC Optiarc employees reporting that he had "confirmation today that HLDS may not be able to fully support the demand (TAM) that they have been given for HH PATA DVDRW. With the last TAM re-adjustment for Q3, HLDS won 60% TAM of HH PATA DVDRW. . . HLDS confirmed that they are having issues procuring enough of there [sic] OPU for the PATA DVDRW drive. They may only be able to support 40%-50% of the Dell overall PATA DVDRW TAM starting in Oct." Williams went on to propose that PLDS would work to push Dell for additional TAM.

151.    In October 2007, Kris Williams of Sony NEC Optiarc e-mailed Vincent Chng of Sony NEC Optiarc advising the new employee that "[t]he only other piece you need to round out your job responsibilities, is the data gathering piece from other suppliers. I think that you can be more bold with Tokyo if you have good info on competitors." Later in the e-

38

mail string, Vincent Chng requested contact from Williams' contact at HLDS. In response, Mr. Williams responded, "Jason should contact you soon. . . . I will also try to put you in contact with Matt from TSST. . . . I will give you contact info for him." On information and belief, Jason refers to Jason Kim from HLDS and Matt refers to Matthew Lee at TSST.

152. In December 2007, in response to an internal question regarding rankings for a Dell supplier review, Kris Williams of Sony NEC Optiarc openly acknowledged his competitor contacts:

> Dell does not share the other ODD supplier information.
>
> We have to contact each supplier and exchange our information.
>
> I have committed to Vincent that I will help him compile the other ODD supplier scores.
>
> I should have all the other suppliers scores by the end of the day.

153. In March 2008, Kris Williams of Sony NEC Optiarc e-mailed Vincent Chng of Sony NEC Optiarc asking for the pricing of any current HH BD products being sold to Dell. In response, Chng stated that he did not think Dell "will share this kind of info with" him, but then stated: "But I have checked with PLDS and they mentioned that the HH BD writer that they are supplying now is at USD250. This price is rather high cuz [it's] a very old drive that they are shipping to Dell. According to him, the market price should be around USD150."

154. In August 2008, Vincent Chng of Sony (Vincent.chng@ap.sony.com) e-mailed a number of Sony Optiarc and Quanta employees, including Shu-ming Tzeng of Quanta thanking the team for participating in an Internet Negotiation for Dell of ODD products and reporting the final prices of all competitors in the procurement event. Mr. Chng stated that "HLDS $31.35 is their Q4 RFQ price. (They provided Q3 and Q4 price in their RFQ submission) According to HLDS, PLDS RFQ price for jam 09 is below $31. (I will check out this price)."

155. In July 2007, Kris Williams of Sony NEC Optiarc America, Inc. compiled information about slim PATA tray-loaded DVD-RW drives, TEAC confirmed that it was

paying $1.91 for one of the component parts of the drive.

156.    In November 2007, an internal e-mail from Kris Williams of Sony NEC Optiarc reported his conversation with TEAC during the middle of an internet negotiation with Dell discussing the bids in Dell's internet negotiation.

### E.    Governmental Antitrust Investigations of the ODD Industry

157.    In and after 2009, ODD manufacturers including Toshiba, HLDS, Sony, and Royal Philips acknowledged in public filings by themselves or their parents that they received DOJ subpoenas related to an antitrust investigation into the ODD industry or were the target of a DOJ investigation in that industry.   According to one of the news articles, an unnamed source said "the Justice Department started a criminal antitrust probe into the market for optical drives in recent months, investigating disk-drive makers for possible price-fixing, bid-rigging and allocation of markets."

158.    On October 27, 2009, the DOJ confirmed that, "[t]he antitrust division is investigating the possibility of anticompetitive practices in the optical disc drive industry."

159.    The DOJ confirmed its activities in a formal motion to stay proceedings in the related class proceedings filed on May 20, 2010, wherein it stated that "[t]he DOJ is currently investigating possible criminal violations in the Optical Disk Drive ('ODD') industry."   The DOJ's investigation has already yielded a guilty plea from HLDSI and four executives, as discussed above.

### F.    Economic Data on Pricing and Supply

160.    ODD pricing during the Relevant Period did not behave as would be expected in a competitive market.

161.    After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, the ODD market has been characterized by unnatural price stability and certain periods of upward pricing trends.

162.    The cost of manufacturing ODDs should have declined as the industry

DELL'S COMPLAINT

consolidation and manufacturing bases shifted to lower-cost countries. In a competitive market this would be reflected in downward pricing trends as well. However, prices for computer storage devices, including ODDs, started to level off.

163.  As noted above, according to industry sources and statements by Defendants and their co-conspirators, firms increasingly attempted to stabilize pricing and avoid continued decreases in pricing and, presumably, profit margins.

164.  If they had acted independently, ODD makers would have had different incentives, depending on the size of their market share in an existing generation of optical disc technology. The fact that Defendants and their co-conspirators uniformly held off on significant price reductions regardless of share demonstrates that they were acting conspiratorially. Because of these different incentives, stable prices cannot be explained merely as conscious parallelism.

165.  As one news report issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary observed,

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years. HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now. The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.

## G.    History of Collusion in Other Markets

166.  Many of the Defendants and their co-conspirators have a long history of collusion, and have been involved in antitrust investigations into other technology-related products, or have admitted to participating in anticompetitive cartels involving technology-related or other products. To the extent these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant Defendant or co-conspirator for at least a portion of the Relevant Period.

41

167.    **Magnetic Videotapes**—In November of 2007, the European Commission ("EC") fined Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

168.    **Optical Disc Licensing Policies**—In July of 1994, the DOJ announced that it was conducting an investigation into the licensing practices of several leading companies that own and license CD manufacturing patents to determine if there have been violations of United States antitrust laws. The companies were believed to include Sony and Royal Philips. It was reported that the two companies signed a "pact" in the late 1970s, agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors. It was further reported that the DOJ had issued subpoenas to several companies dealing with Royal Philips and Sony, including DiscoVision Associates, a subsidiary of Pioneer.

169.    In August of 2006, the EC initiated an investigation regarding the procedures required in order to obtain a license for BD and HD-DVD standards.

170.    As noted above, in October of 2008, it was announced that two of the major players in the ODD market, Sony and Royal Philips, were fined by the TFTC for their anticompetitive business practices in connection with their abuse of monopoly power in the licensing of the technology for CD-Rs.

171.    **Gas Insulated Switchgears**—In January of 2007, Hitachi and Toshiba were fined by the EC for their roles in a conspiracy to control prices and allocate market shares in the market for gas insulated switchgears between 1988 and 2004.

172.    **DRAM**—In October of 2005, Samsung admitted guilt and paid a $300 million fine following an investigation by the DOJ into price-fixing among manufacturers of DRAM.

173.    On May 19, 2010, the EC announced that it was fining ten companies a total of €331 million for participating in an international cartel to fix DRAM prices. Among those fined were Samsung, NEC, Hitachi and Toshiba.

174.    **SRAM**—Samsung and Toshiba have acknowledged being contacted by the

42

DOJ as part of an investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

175.    **CRTs**—In a cease and desist order dated October 7, 2009, the JFTC levied $37.4 million in fines against five companies for alleged participation in a price-fixing cartel for CRTs, including, LG Philips Displays Korea Co. and an arm of South Korea's Samsung group and their affiliates.

176.    Korea's Fair Trade Commission has fined more than five manufacturers of CRTs over $48 million.  The European Commission imposed the biggest antitrust penalty in its history, fining seven companies a combined €1.47 billion ($1.92 billion) related to price fixing of CRTs.

177.    In November of 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received requests for information from the Canadian Competition Bureau with respect to alleged antitrust violations relating to CRTs.

178.    Since February 10, 2009, the DOJ has issued six indictments against individuals in connection with the CRT price-fixing conspiracy.  In May 2011, Samsung SDI Company Ltd., a Samsung subsidiary, agreed to pay a $32 million criminal fine and pled guilty to charges brought under the Sherman Act.  Specifically, SDI admitted to participating in a conspiracy among major CRT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CRTs sold in the United States and elsewhere.

179.    **TFT-LCDs**—In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the TFT-LCD market.  On December 12, 2006, news reports indicated that Samsung, Toshiba, LG and Hitachi, as well as an LCD joint venture between Philips and LG Electronics—LG Display Co., Ltd.—were all under investigation for price fixing TFT-LCDs.

180.    In December of 2008, the DOJ announced that: (a) LG Display, a joint venture between LG and Royal Philips, pled guilty to an information alleging antitrust price-fixing

allegations with respect to TFT-LCDs and had agreed to pay a $400 million fine and (b) Sharp pled guilty to bid-rigging with respect to certain customers of TFT-LCDs, including Dell, and had agreed to pay a fine of $120 million.

181.    On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi Displays, a subsidiary of Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD Products. In its plea agreement, Hitachi Displays admitted to reaching agreements to fix the prices of LCD panels sold to Dell.

182.    In December of 2008, the JFTC fined Sharp and Hitachi with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

183.    It is widely believed that Defendant SECL is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel.

184.    **Similarities with ODDs**—As in the TFT-LCD industry, many of the Defendants here are not just the major manufacturers and sellers of the ODDs, but are also vertically integrated major manufacturers of products containing ODDs. For example, the LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD computer monitors and flat panel televisions. Here Samsung, Toshiba, and Sony manufacture and sell both ODDs and computers containing ODDs.

185.    The ODD market has a similar oligopoly structure to that of the TFT-LCD, DRAM and CRT industries. The Defendants' entry into price-fixing agreements in those markets (which include many of the same foreign companies) supports the DOJ's investigation and other evidence showing the existence of an anticompetitive conduct in the ODDs market.

186.    The established illegal conduct of Hitachi, LG, Royal Philips, Sony and Samsung (as well as Sharp) in a wide variety of product markets across the world, including the United States, is illustrative of Defendants' and their co-conspirators' respective corporate cultures which encourage illegal activities aimed at furthering the company's bottom line at

44

the expense of consumers.

187.    The facts as alleged herein show that the conduct of Defendants and their co-conspirators was directed both at customers in the United States and at United States import commerce for ODDs. The conduct alleged herein was directed specifically at customers throughout the United States, including Dell in Texas. The conduct of Defendants and their co-conspirators also had a direct, substantial, and reasonably foreseeable effect on United States commerce of ODDs. Defendants and their co-conspirators collectively imported many millions of ODDs into the United States, which were purchased by persons and entities in the United States, throughout the Relevant Period. The collective monetary value of such commerce was in the billions of dollars.

## VII.    FRAUDULENT CONCEALMENT

188.    Prior to at least October 26, 2009, Dell did not have information sufficient to constitute actual or constructive knowledge of the conspiracy alleged herein. Dell did not discover, and could not have discovered through the exercise of reasonable diligence, sufficient facts to show the existence of the conspiracy alleged herein. Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put Dell on inquiry notice that there was a conspiracy to fix prices for ODDs.

189.    Because Defendants' and their co-conspirators' agreements, understandings, and conspiracies were kept secret until October 26, 2009, Dell was not aware before that time of Defendants' and their co-conspirators' unlawful conduct alleged herein, and did not know before that time that it was paying artificially high prices for ODDs throughout the United States during the Relevant Period.

190.    The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection, in part by the following:

      a.   Agreeing not to discuss publicly or otherwise reveal the acts and communications in furtherance of the price fixing conspiracy;

45

b.  Agreeing to limit the number of representatives from each Defendant or co-conspirator that were aware of the price fixing conspiracy;

c.  Agreeing to limit the written communications relating to or in furtherance of the price fixing conspiracy;

d.  Agreeing to meet in furtherance of the price fixing conspiracy in locations where the conspiracy was less likely to be detected;

e.  Coordinating bidding and price negotiation to avoid detection;

f.  Giving false and pretextual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion.

191.    By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.

192.    In the context of the circumstances surrounding Defendants' and their co-conspirators' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' and their co-conspirators' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' and their co-conspirators' ODD prices before October 26, 2009.

193.    Dell could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

194.    Defendants and their co-conspirators also committed affirmative acts of concealment of the conspiracy, including, *inter alia*, periodically issuing press statements falsely asserting that ODDs were competitively priced. For example, in October, 2004 Lite-On President Danny Liao claimed that increasing competition for OEM orders had pushed down prices for 16x DVD burners to as little as $60, and that competition would drive some manufacturers from the market.

46

DELL'S COMPLAINT

195.    Defendants and their co-conspirators also concealed their collusive conduct by claiming pretextual reasons for the price levels of ODDs in response to customer requests to lower prices or in general statements to the trade.

196.    With respect to the bid-rigging activities described above, no participating Defendant advised Dell or the public of the collusive activity that was occurring with respect to bidding to supply ODDs. Instead, they made public statements that the ODD industry was intensely competitive, such as statements made in (a) Hitachi's SEC Form 20-Fs of August 30, 2004, August 26, 2005, August 7, 2006, June 26, 2007 and July 27, 2009; and (b) NEC's SEC Form 6-Ks of April 27 and May 31, 2005.

197.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, Dell is entitled to recover for any claims that Dell has as a result of the anticompetitive conduct alleged in this Complaint notwithstanding the statute of limitations.

198.    Dell's claims are also tolled by the filing of various class action lawsuits shortly after the conspiracy was made public in October 2009, by ongoing government investigations, and by any other tolling available by operation of law.

## VIII.   DELL'S CONTRACTS WITH HLDS, LG, AND TOSHIBA

### A.      HLDS MPAs

199.    On May 1, 2002, Dell Products L.P. and HLDSI entered a Preferred Supplier Incentive Agreement, which agreement incorporated the terms and conditions from the Master Purchase Agreement entered between Dell Products L.P. and Hitachi Ltd. ("Hitachi MPA"). These agreements set forth the initial terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain ODDs from HLDSI.

200.    Dell Products L.P. and LGE also entered a Master Purchase Agreement ("LGE MPA"), which agreement sets forth the terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase certain ODDs from LGE.

201.    Since it became effective, both Dell and LGE have treated the LGE MPA as applicable to all ODDs purchased by Dell Inc., and any of its affiliates and subsidiaries, from

47

LGE, and any of its affiliates and subsidiaries regardless of the specific parties which entered the LG MPA or which sold or purchased the ODDs.

202. On April 20, 2007, HLDSI notified Dell that HLDSI and Hitachi-LG Data Storage Korea Inc. had been performing LGE's obligations under the LGE MPA and that they were formally assuming all obligations and liabilities of LGE under the LGE MPA.

203. Collectively, the Hitachi MPA and the LGE MPA make up the "HLDS MPAs."

204. Since the HLDS MPAs became effective, both Dell and HLDSI have treated the HLDS MPAs as applicable to all ODDs purchased by Dell Inc. and any of its affiliates and subsidiaries, from HLDSI and any of its affiliates and subsidiaries, regardless of the specific parties which entered the HLDS MPAs or which sold or purchased the ODDs.

205. The HLDS MPAs requires HLDSI and Hitachi-LG Data Storage Korea Inc. to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the agreement.

206. As described throughout this Complaint, HLDSI and Hitachi-LG Data Storage Korea Inc. failed to comply with all applicable laws in connection with their provision of ODDs to Dell, including both U.S. and foreign antitrust and laws. Accordingly, HLDSI, and Hitachi-LG Data Storage Korea Inc. have breached the HLDS MPAs.

207. The HLDS MPAs permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at law or in equity. Therefore, Dell is entitled to damages and all other available remedies on account of HLDSI's and Hitachi-LG Data Storage Korea Inc.'s breach.

**B.     Toshiba MPA**

208. Dell Products L.P. and Toshiba Corporation entered a Master Purchase Agreement ("Toshiba MPA"), which agreement sets forth the terms and conditions by which Dell Products L.P. and all of Dell's subsidiaries and corporate affiliates purchase ODDs from Toshiba Corporation and its subsidiaries.

209. Since it became effective, both Dell and Toshiba Corporation have treated the

48

Toshiba MPA as applicable to all ODDs purchased by Dell Inc., and any of its affiliates and subsidiaries, from Toshiba Corporation and any of its affiliates and subsidiaries regardless of the specific parties which entered the Toshiba MPA or which sold or purchased the ODDs.

210. On February 27, 2004, Toshiba Corporation informed Dell that it was transferring its ODD business to Toshiba Samsung Storage Technology Corporation as of March 30, 2004, and that the terms and conditions of the Toshiba MPA would apply to Dell's purchases of ODDs from Toshiba Samsung Storage Technology Corporation.

211. Since the Toshiba MPA became effective against Toshiba Samsung Storage Technology Corporation, both Dell and Toshiba Samsung Storage Technology Corporation have treated the Toshiba MPA as applicable to all ODDs purchased by Dell Inc. and any of its affiliates and subsidiaries, from Toshiba Samsung Storage Technology Corporation and any of its affiliates and subsidiaries, regardless of the specific parties which entered the Toshiba MPA or which sold or purchased the ODDs.

212. The Toshiba MPA requires Toshiba Corporation and Toshiba Samsung Storage Technology Corporation to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over their activities in connection with the agreement.

213. As described throughout this Complaint, Toshiba Corporation and Toshiba Samsung Storage Technology Corporation failed to comply with all applicable laws in connection with their provision of ODDs to Dell, including both U.S. and foreign antitrust and unfair competition laws. Accordingly, Toshiba Corporation and Toshiba Samsung Storage Technology Corporation have breached the Toshiba MPA.

214. The Toshiba MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at law or in equity. Therefore, Dell is entitled to damages and all other available remedies on account of Toshiba Corporation's and Toshiba Samsung Storage Technology Corporation's breach.

## IX.    COUNT I – CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1
### (ALL DEFENDANTS)

215. Dell incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

216. Beginning on or about January 1, 2004, the exact date being unknown to Dell, Defendants and their co-conspirators agreed to stabilize the prices of ODDs sold in the United States in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

217. Defendants and their co-conspirators participated in a price-fixing conspiracy during the Relevant Period. The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize and maintain prices for ODDs. Pursuant to this price-fixing conspiracy, the Defendants and their co-conspirators engaged in a series of integrated and overlapping acts, including the rigging of bids for ODDs in procurement events conducted by certain OEMs, specifically including Dell; the sharing of confidential information, including pricing, sales, production, bidding strategies and rankings, pull rates, and TAM, that facilitated price coordination; cooperation agreements pursuant to which prices for ODDs sold in the United States to both OEMs and non-OEMs were set; and allocating customers and markets.

218. Dell paid higher prices for ODDs than it would have paid in a competitive market as a direct result of Defendants' and their co-conspirators' unlawful conduct.

219. The price-fixing conspiracy alleged herein caused the prices of ODDs the Defendants and their co-conspirators sold to Dell to be higher than they would have been but for the conspiracy.

220. The price-fixing conspiracy alleged herein was undertaken for the purpose and with the effect of fixing, maintaining, raising or stabilizing prices for ODDs, which caused prices for ODDs to be maintained at supra-competitive levels. The price-fixing conspiracy alleged herein constitutes a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

221. Defendants' and their co-conspirators' price-fixing conspiracy occurred in or affected interstate and international commerce.

222. The price-fixing conspiracy alleged herein had the following effects:

50

DELL'S COMPLAINT

a.   Dell was deprived of the benefits of free, open and unrestricted competition in the market for ODDs;

b.   Competition in establishing the prices paid for ODDs was unlawfully restrained, suppressed and eliminated; and

c.   Prices charged to Dell for ODDs were raised, fixed, maintained or stabilized at higher, artificially inflated, noncompetitive levels.

223.   As a proximate result of Defendants' and their co-conspirators' unlawful conduct, Dell has suffered injury to its business or property in that it paid higher prices for ODDs than it otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

224.   By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Dell has sustained injury.  As a direct result of Defendants' and their co-conspirators' conduct, the injury sustained by Dell is the payment of supra-competitive prices for ODDs. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## X.   COUNT II – BREACH OF CONTRACT
### (HITACHI-LG DATA STORAGE INC., AND HITACHI-LG DATA STORAGE KOREA INC.)

225.   Dell incorporates by reference all the above allegations as if fully set forth herein.

226.   Pursuant to the HLDS MPAs with Dell, HLDSI and Hitachi-LG Data Storage Korea Inc. agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of ODDs to Dell.

227.   HLDSI and Hitachi-LG Data Storage Korea Inc. have treated the HLDS MPAs as applicable to all ODDs purchased by Dell Inc., and any of its affiliates and subsidiaries, from HLDSI and Hitachi-LG Data Storage Korea Inc. and any of their affiliates and

subsidiaries, respectively, regardless of the specific parties which entered the initial agreement or which sold or purchased the ODDs.

228.   As set forth herein, HLDSI, Hitachi-LG Data Storage Korea Inc., and affiliates and subsidiaries of the same, did not comply with all applicable laws in providing ODDs to Dell, and accordingly HLDSI's, Hitachi-LG Data Storage Korea Inc.'s, and their affiliates' and subsidiaries' sales of ODDs to Dell since the effective dates of the HLDS MPAs and throughout the remainder of the Relevant Period, breached the HLDS MPAs.

229.   Dell is entitled to damages for HLDSI's and Hitachi-LG Data Storage Korea Inc.'s breach in the amount of the overcharges it paid to HLDSI and Hitachi-LG Data Storage Korea Inc. for all ODDs purchases after the effective dates of the HLDS MPAs and throughout the Relevant Period.

## XI.   COUNT III – BREACH OF CONTRACT
### (TOSHIBA CORPORATION AND TOSHIBA SAMSUNG STORAGE TECHNOLOGY CORPORATION)

230.   Dell incorporates by reference all the above allegations as if fully set forth herein.

231.   Pursuant to the Toshiba MPA with Dell, Toshiba Corporation and Toshiba Samsung Storage Technology Corporation agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of ODDs to Dell.

232.   Toshiba Corporation and Toshiba Samsung Storage Technology Corporation have treated the Toshiba MPA as applicable to all ODDs purchased by Dell Inc., and any of its affiliates and subsidiaries, from Toshiba Corporation and Toshiba Samsung Storage Technology Corporation and any of their affiliates and subsidiaries, respectively, regardless of the specific parties which entered the initial agreement or which sold or purchased the ODDs.

233.   As set forth herein, Toshiba Corporation, Toshiba Samsung Storage Technology Corporation, and affiliates and subsidiaries of the same, did not comply with all

52

applicable laws in providing ODDs to Dell, and accordingly Toshiba Corporation's, Toshiba Samsung Storage Technology Corporation's, and their affiliates' and subsidiaries' sales of ODDs to Dell since the effective date of the Toshiba MPA and throughout the remainder of the Relevant Period, breached the Toshiba MPA.

234.   Dell is entitled to damages for Toshiba Corporation's and Toshiba Samsung Storage Technology Corporation's breach in the amount of the overcharges it paid to Toshiba Corporation and Toshiba Samsung Storage Technology Corporation for all ODD purchases after the effective date of the Toshiba MPA and throughout the Relevant Period.

## XII.    PRAYER FOR RELIEF

235.   WHEREFORE, Dell prays that the Court enter judgment on its behalf, adjudging and decreeing that:

a.      Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Dell was injured in its business and property as a result of Defendants' and their co-conspirators' violations;

b.      HLDSI, Hitachi-LG Data Storage Korea Inc., Toshiba Corporation, and Toshiba Samsung Storage Technology Corporation breached their contracts with Dell for the supply of ODDs;

c.      Dell shall recover damages it sustained, as provided by the federal antitrust laws, and a joint and several judgment in favor of Dell shall be entered against Defendants in an amount to be trebled in accordance with such laws;

d.      Dell be awarded compensatory damages for HLDSI's, Hitachi-LG Data Storage Korea Inc.'s, Toshiba Corporation's, and Toshiba Samsung Storage Technology Corporation's breaches of their contracts with Dell;

e.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from

DELL'S COMPLAINT

continuing and maintaining the combination, conspiracy or agreement alleged herein;

f.    Dell shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

g.    Dell shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

h.    Dell shall receive such other or further relief as may be just and proper.

## XIII.    JURY TRIAL DEMANDED

236.    Pursuant to Federal Rule of Civil Procedure 38(b), Dell demands a trial by jury of all of the claims asserted in this Complaint so triable.


Date:  May 13, 2013

DELL'S COMPLAINT

Respectfully submitted,

By:    /s/ *Jon. G. Shepherd*

Jon G. Shepherd, Esq.
Texas Bar No. 00788402
jon.shepherd@alston.com
**ALSTON & BIRD LLP**
2828 North Harwood Street, 18th Floor
Dallas, TX 75201-2139
Tel: (214) 922-3400
Facsimile: (214) 922-3899

Michael P. Kenny, Esq.
Georgia Bar No. 415064
mike.kenny@alston.com
Debra D. Bernstein, Esq.
Georgia Bar No. 054998
debra.bernstein@alston.com
Rodney J. Ganske, Esq.
Georgia Bar No. 283819
rod.ganske@alston.com
Andrew J. Tuck, Esq.
Georgia Bar No. 402306
andy.tuck@alston.com
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: (404) 881-7000
Facsimile: (404) 881-7777

*Attorneys for Plaintiffs Dell Inc. and Dell Products L.P.*

55

DELL'S COMPLAINT